IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Roneiquea Kennedy, Individually and as Next Friend and guardian *ad litem* for MK, a Minor,<br><br>Plaintiffs,<br><br>vs.<br><br>The United States of America, Sumter Family Health Center (nka Tandem Health), Jaime Pickering, CNM, Giselle Chandler, MD, Palmetto Health Tuomey, Rosemarie Pescasio, RN, Susan West, RN,<br><br>Defendants. | Civil Action No: 3:18-cv-02940-MGL<br><br><br>**COMPLAINT** |

The Plaintiffs, by and through their undersigned counsel, for a Complaint against the Defendants, do hereby allege as follows:

## **PARTIES**

**Plaintiff**

1.  Plaintiffs, Roneiquea Kennedy and MK, are both citizens and residents of Sumter County, South Carolina and have been so for more than three months prior to the commencement of this action. Roneiquea Kennedy brings this action on her own behalf for her own personal injuries and for a necessaries claim for the medical bills/costs of her minor child as well as in her representative capacity as the Next of Friend of and guardian *ad litem* for MK for the damages sustained by her biological daughter MK.

**Defendants**

2. The Plaintiffs bring this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. and 28 U.S.C. § 1346(b)(1) against the United States of America (hereinafter "USA") as the USA is or may be deemed to be the employer, owner, master, and/or proper Defendant of one of more of the below-named Defendants. All claims made against the USA and its employees/agents are made pursuant to the Federal Tort Claims Act. Any below-named Defendant who is determined to be an employee of the USA during the times alleged in the Complaint may be dismissed and replaced with the USA as their employer and proper representative Defendant.

3. Sumter Family Health Center (nka Tandem Health)(hereinafter "SFHC") is a Federally Qualified Health Center (FQHC) in Sumter, South Carolina and provides family medicine, and in particularly, pre-natal and maternal-fetal services including delivery at Palmetto Health Tuomey in Sumter County.

4. Jaime Pickering, CNM, (hereinafter "Pickering") is a certified Nursing Mid-Wife and at all relevant times was employed by SFHC, was at all times acting within the scope and course of her employment and is a citizen and resident of Sumter, South Carolina.

5. Giselle Chandler, MD, (hereinafter "Chandler") is a medical doctor and at all relevant times was employed by SFHC, was at all times acting within the scope and course of her employment, was the supervising physician for Defendant Pickering, and is/was a citizen and resident of Sumter, South Carolina.

6. Palmetto Health Tuomey (hereinafter "Tuomey") is a hospital providing healthcare services, including women's health, labor and deliver, etc., in Sumter, South Carolina.

7. Rosemarie Pescasio, RN, (hereinafter "Pescasio") is a Registered Nurse who provided nursing, labor and delivery as well as other types of medical care to the Plaintiffs during the labor and delivery of MK at Defendant Tuomey's hospital and at all relevant times was employed by Tuomey, was at all times acting within the scope and course of her employment and is/was a citizen and resident of Sumter, South Carolina.

8. Susan West, RN, (hereinafter "West") is a Registered Nurse who provided nursing, labor and delivery as well as other types of medical care to the Plaintiffs during the labor and delivery of MK at Defendant Tuomey's hospital and at all relevant times was employed by Tuomey, was at all times acting within the scope and course of her employment and is/was a citizen and resident of Sumter, South Carolina.

9. There were also other healthcare providers who provided healthcare services to the Plaintiffs and who may have been negligent, grossly negligent and/or reckless in providing such care to Plaintiffs. However, all of these remaining unnamed healthcare providers were employees and acting within the scope and course of their employment with either the USA, SFHC and/or Tuomey and under the doctrines of respondeat superior, agency, apparent agency, master and servant, non-delegable duty, as well as other types of vicarious liability, USA, SFHC and/or Tuomey is/are responsible for their acts and omissions.

10. All of the above-named Defendants were at all relevant times acting within the scope and course of their respective employment.

11. All of the above-named healthcare providers had a patient/healthcare provider relationship with the Plaintiffs and as such had a duty to provide proper, reasonable and appropriate care to the Plaintiffs.

12. Where appropriate, all Defendants are jointly and severally liable.

## JURISDICTION

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because Plaintiffs resided in Sumter County, South Carolina at all times relevant to this Complaint and because the events giving rise to this case occurred in the Columbia Division.

14. Jurisdiction over every defendant except the United States is proper by way of 28 U.S.C. 1367. Supplemental jurisdiction is proper here because the claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

15. Plaintiffs have fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims act by giving formal notice in writing to the United States through the filing of a Form 95 with the Department of Health and Human Services (HHS).

16. The Department of HHS denied Plaintiffs' Form 95 claim on May 29, 2018 and pursuant to 28 U.S.C. § 240l(b) Plaintiffs have filed the instant Complaint within the requisite six (6) months from the date of the mailing of said denial.

## FACTUAL ALLEGATIONS

17. During the late Summer/early Fall of 2012, Plaintiff Roneiquea became pregnant.

18. In early December 2012, Roneiquea began seeing/treating with the Defendants Pickering and Chandler at Sumter Family Health Center (nka Tandem Health) to monitor and care for her pregnancy in Sumter, South Carolina.

19. The last two pre-natal visits noted her blood pressures to be 109/64 and 112/67.

20. On May 18, 2013 Roneiquea was forty (40) weeks and five (5) days into her pregnancy and was admitted to Tuomey Hospital, also in Sumter, South Carolina, pursuant to her healthcare providers' recommendations, for cervical ripening and induction of labor due to postdates pregnancy.

21. The nurses who were employees of Tuomey and who treated Roneiquea during her labor and delivery were Defendants Pescasio and West.

22. Her initial blood pressures upon admission were 134/84 and 166/100. These are considered to be elevated.

23. Elevated blood pressures are indicative of pre-eclampsia or HELLP syndrome and are considered to be high-risk. The supervising physician must be notified, and additional testing is required.

24. Pre-eclampsia and/or HELLP syndrome are well-recognized to increase the insult and mortality of both mother and baby.

25. Defendants Chandler and Pickering were in charge and supervising the labor and delivery of Roneiquea while she was at Tuomey.

26. A 'postdates pregnancy' is a pregnancy that has extended beyond the estimated date of delivery (EDD) + fourteen (14) days.

27. At 6:41 PM on that same day Roneiquea had dilatation of 2-3 cm.

28. No additional testing was performed to address the elevated blood pressures and Dr. Chandler was not notified.

29. At 7:43 PM Pitocin was first administered to Roneiquea.

30. Pitocin is a brand name drug and is the synthetic version of oxytocin, a natural hormone that helps a woman's uterus contract during labor.

31. For women who are having difficulties with getting their contractions started, Pitocin can be administered as a medication to "kick-start" those contractions.

32. To induce labor, Pitocin is administered usually through an IV. The hormone binds to receptors in the uterus, which then activate the uterine muscles to encourage contractions. The contractions will gradually make the cervix dilate and then push baby through the birth canal.

33. However, Pitocin can be extremely dangerous if not administered and monitored correctly.

34. Pitocin triggers contractions, which are necessary for childbirth—but too many contractions in quick succession can actually harm the baby.

35. Every time there is a contraction, it squeezes the blood vessels, thereby decreasing the blood supply to the placenta and the baby's oxygenation is dependent on a good flow of maternal blood to the placenta.

36. If the contractions are too often, too long or too strong, the baby can become depleted of oxygen from the mother causing severe and permanent damage to the baby's brain as well as other organs.

37. If this occurs, intrauterine resuscitation is performed. This means the Pitocin is stopped, IV fluid bolus is administered, high-flow oxygen is given, the mother is turned to her side and the physician should be notified. This was not done.

38. Roneiquea was also noted with recurrent late decelerations with moderate variability which confirms fetal intolerance.

39. These are serious signs that the baby is in severe distress and at risk of being permanently injured.

40. However, Roneiquea's healthcare providers, those being Chandler and Pickering chose to continue on with a vaginal delivery.

41. Roneiquea's contractions became so severe and long that she requested an epidural to deal with the pain. She now had dilatation of 3 cm and at 10:56 PM her blood pressure was 174/101 and at 10:59 PM her blood pressure was 197/91.

42. Early the next morning on May 19, 2013 at 3:23 AM Roneiquea had an Artificial Rupture of Membrane (AROM).

43. At 3:30 AM Roneiquea had Dilatation of 4 cm with minimal baseline variability noted.

44. At or around 3:30 am on May 19, 2013, despite the persistent elevated blood pressures of mother and the fetal monitoring showing excessive uterine activity with fetal intolerance, the Defendant Chandler ordered the nurses to increase the Pitocin.

45. At 5:50 AM hours Roneiquea had Dilatation of 6 cm.

46. At 5:53 AM Roneiquea's blood pressure was 156/82 and the nursing staff notified Defendant Pickering (the mid-wife) but no orders were received from her or from Dr. Chandler.

47. At 8:23 AM Roneiquea's blood pressure was 153/71 and at 8:34 AM Roneiquea's healthcare providers recommended to initiate pushing.

48. Despite an inability to determine the fetal heartbeat baseline, Defendant chandler proceeded with the delivery of MK.

49. At 9:47 AM Roneiquea delivered a female baby named MK via vaginal delivery with APGARS 4, 7, 8 at 1, 5 and 10 minutes respectively.

50. Shortly after the birth, MK was transferred to the Newborn Nursery.

51. Despite these obvious and continued signs of distress for both baby MK and mother Roneiquea, none of the nurses who were attending to Roneiquea addressed these issues either amongst themselves, with the mid-wife Defendant Pickering or the treating physician Dr. Chandler or went above the chain of command to another doctor or hospital administration.

52. Also, despite these obvious and continued signs of distress for both baby MK and mother Roneiquea, neither Dr. Chandler nor Nurse Mid-Wife Pickering addressed these issues and simply pushed on for what was surely going to be very dangerous vaginal delivery.

53. Since the birth of MK, she has been examined by neurologists and other healthcare providers who have diagnosed her with a diffuse global hypoxic ischemic event with stroke present throughout both cerebral hemisphere, anterior and posterior

portions of the corpus callosum which was a profound anoxic ischemic injury and posterior parietal subdural hematoma.

54. Due to these severe physical deficits to MK's brain, she has suffered a catastrophic loss of brain function as well as ability to grow and thrive.

55. Roneiquea also went through a great deal of additional pain and suffering as a result of the acts and omissions of these Defendants.

56. Since the delivery and injury to MK, the Plaintiffs have incurred hundreds of thousands of dollars of medical bills for medical treatment, spent countless hours and days not only receiving treatment but traveling great distances to obtain the required and highly specialized medical care and they have incurred and will incur additional economic losses for future medical care and treatment for the remainder of MK's life.

57. From the first time that Roneiquea realized that her baby MK had a severe brain injury, she was assured by these Defendants, as well as by other healthcare providers, that what happened to MK was "just one of those things that sometimes happens" and she certainly had no idea that it may have been the result of malpractice.

58. However, for the first time on February 16, 2016, when Roneiquea had an extensive consultation with MK's pediatric neurologist, Dr. Harley Morgan, she was informed or was led to believe that the injury to her child may have been the result of improper actions of the labor and delivery staff.

59. The mental anguish the Plaintiffs have suffered and will suffer in the future from the results of these failures have been exacerbated many-fold by knowing that this was a very preventable injury but for the Defendants' failure to act and provide Roneiquea and her baby MK with the care they were entitled to.

60. This horrible tragedy occurred because of Defendants' failure to perform the duties that they all owed to their patients Roneiquea and her baby MK.

61. The Defendant physicians, nurses, healthcare providers and healthcare facilities deviated and departed from the prevailing and accepted standards of medical care by way of, including but not limited to, the following:

<u>As to Defendants Chandler and Pickering (and their employers)</u>:

a) by ignoring the elevated blood pressures of Roneiquea and never evaluating her for pre-eclampsia;

b) by giving Pitocin with absent accelerations, minimal variability, variable decelerations and increasing Pitocin during labor with non-reassuring electronic fetal monitoring strips;

c) by failing to stop the Pitocin with non-reassuring strips and tachysystole by (tachysystole is defined as six (6) contractions in a ten (10)-minute period);

d) by failing to contact a physician despite having fetal decelerations (slowing and dangerous heartrate of the infant);

<u>As to Defendants Pescasio, West and their employers (Tuomey) and all other employees of Tuomey)</u>:

e) by failing turn off Pitocin in the face of tachysystole and with non-reassuring fetal heart rates;

f) by failing to properly follow orders;

g) by increasing Pitocin despite non-reassuring strips;

h) by failing to have in place proper policies and procedures to ensure proper and timely management of a patient giving birth with abnormal readings;

i) if any of these policies and procedures were in place, then by failing to properly train their employees or enforce said policies and procedures; and,

j)  by any other act or omission that constituted a deviation from the required standard of medical care by these (all) Defendants as may be learned during the discovery process in this action.

62. Had Defendants acted within the standard of care, Plaintiffs more likely than not would not have suffered the losses they have suffered and will suffer in the future.

63. It is without question now that Baby MK will require a lifetime of extensive medical care and round-the-clock daily care.

64. The injuries and losses to the Plaintiffs were the direct and proximate result of and were caused and occasioned by the negligence, gross negligence, carelessness, recklessness, willfulness, and wantonness on the part of all Defendants, in failing to possess and exercise that degree of medical training, competency, and skill ordinarily and customarily possessed and exercised by physicians and other healthcare professionals under similar circumstances and thereby rendered inappropriate medical care to Plaintiffs by deviating from and falling below the prevailing and acceptable standards of care in one or more of the particulars outlined herein.

65. Attached as Exhibit A, B and C are the affidavits of the qualified medical experts who will testify to one or more deviations from the standard of care by the various healthcare Defendants.

**FOR A FIRST CAUSE OF ACTION**
(PERSONAL INJURY ACTION)
(Medical Malpractice)

66. The Plaintiffs incorporate by reference all previous paragraphs above as if repeated herein.

67. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness and associated departures from the professional standards of care by all Defendants, Plaintiffs suffered in the past and will suffer in the future from severe debilitating injuries which have resulted in Madison's permanent injury and disability, past and future conscious pain and suffering, as a result of which she/they is/are entitled to recover a sum to compensate her/them for her/their past and future conscious pain and suffering, past and future medical expenses, past and future mental anguish, past and future loss of earnings capacity, past and future loss of enjoyment of life, and other past and future damages pursuant to South Carolina law.

68. All damages should be in an amount determined by the trier of fact in this action.

69. Plaintiffs are also entitled to reasonable attorney's fees and costs associated with the prosecution of this claim.

WHEREFORE, Plaintiffs respectfully pray for judgment against all the Defendants, both jointly and severally where appropriate, for all actual damages, special damages and consequential damages in an amount to be determined by the trier of fact at the trial of this action, for the costs and disbursements of this action and for such other and further relief as this Court deems just and proper. Plaintiffs specifically aver that the damages at issue in this case are more than $100,000, such averment is made to allow all manner of discovery.

- 13 -

**MCGOWAN, HOOD, & FELDER, LLC**


    s/ Robert V. Phillips
Robert V. Phillips, Esq.
1539 Health Care Drive
Rock Hill, South Carolina 29732
Federal Bar ID: 07653
South Carolina Bar ID: 68458
803.327.7800 - O
803.328.5656 - F
rphillips@mcgowanhood.com

Rock Hill, South Carolina
October 29, 2018